All right, sir, when you're ready. Raymond Atkins, Your Honors, on behalf of the Association of American Railroads. With your permission, I'd like to start by trying to unpack our claim of preemption of the underlying state law and why the Association should have standing to raise it. ICTA preemption is not really that complicated. A law can be... I know. Let me try, Your Honor. I'm not persuaded by your first point. So, ICTA can preempt a law either under the express or implied doctrine. The express test is whether it's managing or governing rail transportation. So what you're looking for is evidence of direct regulation of rail transportation. That, by its sweep, is not intended to capture things that are remote or incidental, but things that directly are regulating the railroad's operations. Now, that test is well established in all the circuits. The only question is whether you call it express preemption or categorical preemption. But that's just a label. The test is the same. If it's not expressly preempted, then you do an implied preemption analysis. And the test there is twofold, whether it's discriminatory or unreasonably burdensome. And you can find that two-part test, Your Honors, in virtually every court that has addressed it, the City of Alexandria case, as well as the Third Circuit, the Sixth Circuit, the D.C. Circuit, and the STB. Now, again, some courts call that as applied, but as you've said, that's just a label. It's basically the same two-part test. So turning to the discrimination prong, the government concedes that it's a freestanding limitation on state exercise of things like plumbing codes, electrical codes, environmental regulations, and the sort. But it just doesn't apply to this type of regulation. I see you have a question. Yes, Your Honor. I'm sorry. No, I am perplexed at an even more threshold level about this case because it's a standing case. Yes, Your Honor. Right? So whether you are right or wrong about the nature of a discrimination claim, like, I don't even see why that matters. You surely have standing to bring the claim. And the district court held that you don't by saying it loses on the merits. And I am just finding the whole posture of this case confounding. I appreciate that, exactly. This is like a merits case wrapped up in a standards case. Right, but those are supposed to be two separate things. You've said that a million times. Right. And that would be grounds for you to remand this issue. But the reason the court said that we lack standing and that you had to bring, there had to be an individual member to attend, is because he ruled that the discrimination claim just doesn't exist. And he cited the City of Alexandria case, which I can talk about in a bit. But so you're right. So that's why it looks like a merits case. It looks like a 12B6 case where it's dismissed. I want to come back to what I think Judge Harris was asking you. Do we have a threshold issue here about associational standing? And it seems to me that the whole question of associational standing would indicate that the individual railroad would have to be involved. And saying that an individual railroad should be involved for purposes of associational standing would seem to feed into the argument that the state is making that these should be resolved by a crossing basis rather than in the aggregate. So there's a threshold problem you have about whether a trade association can bring a claim or whether you need to await for standing purposes a situation where a particular railroad is faced with a particular application from a broadband provider and the railroad rejects it and then it goes up to the state corporation commission and everything. But it's clear that standing exists in that situation. But I have a greater reservation about whether standing exists here. And I'm wondering whether, just speaking for myself, whether you need to satisfy me on that point. I hope to, Your Honor. Before we get into some of these mega issues. That is unequivocally the issue that's presented is do we have standing to present these two challenges. And that's why I started with discrimination. Because, Your Honor, we don't need Norfolk Southern or CSX or any individual railroads participation if the law is discriminatory, it's preempted, full stop. And so we don't need an individual application. Every application is going to be discriminatory. It's bespoke. If I were to grant you that, if it's discriminatory, it's preempted. And I gather you would say if there's an undue burden, it's preempted.  And you want to resolve all these things in the aggregate. Correct. The state makes the point that as far as discrimination is concerned, there's no discrimination because there's no comparator. The state is saying that the eminent domain power is being applied in a discriminatory fashion to railroads because no other landowner is required to do this expedited process. So it's unique to you.  But then the state comes back in response to your argument and says, okay, it may be unique to you, but railroad are unique, that there's no comparator because there's no other landowner that has tracks going through with a broad implication, a public implication. And so they're saying, all right, no comparator, no discrimination. And then they're indicating that there is no unreasonable burden because the statute contains all kinds of defenses that the railroad can offer with respect to public safety or inadequate compensation or what have you. So in light of the statutory defenses provided to the railroad, that relieves the undue burden. So you've got to grapple with that, it seems to me, if you can get past the associational standing. I totally agree. That goes to the merits. There's two commonplace defenses to discrimination. One is that the railroads are unique. Or the other one is that if there are similarly situated property owners, that they're burdened by a similar set of regulation. That's the analysis that, say, for example, the Third Circuit applied in the New York-Sasquatch case, the Jackson case. Those all go to the merits. They don't go to our standing to present this challenge. And I'll give you an example of somebody who's similarly situated. If you're familiar with Northern Virginia, you've got the toll road. It's a privately run stretch of highway that runs from Dulles all the way up to Leesburg. They're not burdened by this yet. They're a continuous stretch of property that broadband providers can't cross unless they go through the state general eminent domain statute. So we know that that's our burden. I want to go back to another point I'm making, and that is can we tell that something . . . There's something about this case that the state is saying is premature. Maybe it's a ripeness issue. Maybe it's not. But there's a prematurity issue. And if this statute is an undue burden or places an undue burden on the railroads, can we resolve that on a speculative basis? Or do we need to see how the statute works out in practice to see whether as a practical matter and in light of experience, there's an undue burden on the railroads from this expedited process? Why should we wait? So, okay, that's the unreasonable burden challenge, which is separate from our discrimination challenge. So I don't want to leave discrimination without satisfying the court that we don't need individual participation and all of these defenses go to the merits. They should not go to the core right of the association to present a challenge that a law is preempted because it's discriminatory. And if you agree that that test does exist, see City of Alexandria, then it was a mistake to dismiss on standing on that grounds. But now let me turn to unreasonable burden, which is a second prong of the implied preemption doctrine. Here, the core concern of the AAR is we're bringing sort of a cumulative burden type of analysis to this case. What we're saying, we have two core allegations in the complaint. One is that there's insufficient time. Thirty-five days is just not enough time for the railroads to do the kind of safety analysis that they need. That's our allegation, which should be taken on face value as being accurate until it's tested in the merits process. The second one is that these are unmovable obstructions on the railroads right away. So before they come in, the railroad's right to use its property is paramount. But after the broadband company comes in and gets an easement, their rights become paramount. And it's not one-off, Your Honor. It's not there's one case or there's two cases where it's the burden flows from the cumulative effect of that. And it's important for the AAR to be able to at least present that challenge on the merits and have standing to raise it. Whether we win, Your Honor, that's our burden. We have to demonstrate. I know, but just aren't you asking a lot of us at this stage to say. I don't think so, Your Honor. You're asking us for a facial invalidation of the statute based on an implied preemption theory. And isn't that asking a lot of us at this stage of the game? I'm not asking you to rule on the merits, Your Honor. All I'm asking you is that the association has standing to present the challenge. If it's discriminatory, it's preempted. And that should be. And then the whole statute is. And it's not done on the express because they're not directly managing or governing rail transportation. It's done under the implied preemption doctrine. And there's no reason that we have to bring an individual case because in every instance it's going to be discriminatory. That might be right for the discriminatory prong. Yes. You can challenge it on its face. Yes. When it comes to the undue burden argument, you're saying in the aggregate the burden will be undue on railroads, that if you consider all the applications that will be granted. Yes. I mean, that's saying consider future applications individually and then aggregate them and we have standing to bring that claim. Right. Why is that true? So I'll point you to it. So it's intrinsic in an unreasonable burden analysis, Your Honor, that you are going to consider the cumulative burden of this law. So examples might be when the Supreme Court said that you can't regulate train length. They looked at the cumulative burden on the railroad industry from having that type of regime imposed on them. A similar example would be when the District of Columbia said we're going to require you not to route HAZMAT within a hundred feet of the capital. The analysis that was done was what's the cumulative burden on the railroad industry. It's not just one application of the law that hurts an interstate rail network. It's the repeated application of the law. And it's that it's – is it not also that it always will be that burden? So, I mean, your argument would have to be right. Thirty-five days would in no case ever be enough time. That's the allegation in the complaint, Your Honor, which I think you need to take on face value that 35 days is just – is not sufficient. But if it proves to be an undue burden in practice, is your remedy not to go back to the state legislature and have them amend the statute and –  Wait a minute. There may be a political angle to this that you go by and say here's the evidence we have. This is proving to be an undue burden. You need to amend the statute and relieve us from this expedited consideration. I'm sure the railroads would undertake that conversation. They talk to the state's legislators all the time. But we have a fundamental right. If it's unreasonably burdensome, it's preempted by federal law. We don't need to go and ask them to change it to conform it to what's required of the Constitution. We have a right to go to court and have standing to present our argument. I appreciate Judge Rushing. I really do appreciate that the cumulative type of analysis is much more difficult than just say there's a particular crossing where it's just egregious, where they're telling us we have to shut down the railroad for like three months in order to do this crossing. We'd argue that's unreasonably burdensome on just looking at that one crossing. But what we're here today to try to defend for the AER is its right to at least present the cumulative burden challenge on the merits. And so if you think it's going to be a tough road, we should at least have standing to present that challenge and not be told that the whole theory is inapplicable, that that theory of unreasonable burden cannot be presented by the AER. And that's what the law – that's the basis on which the law requires it. Let me just ask you a practical question. How many crossings are there? How many broadband applications for a crossing are there in any given year? Is there an average of them? Are we talking about dozens or hundreds or what? How many? I'd be speculating a little bit. I believe it's hundreds, Your Honor. I'll ask my colleague, too, if we know if that's in the record. As you can imagine, the railroads are everywhere. They have so many of them, Your Honor. How many are there? Do you have a number for me? No. I mean how can you say it's an undue burden when you won't tell me what the number of broadband applications are? So the key question is how many places can they cross us? And I can tell you that there's lots of public crossings and there's lots of private crossings and there's lots – so there's so many of them, Your Honors, that the railroads have set up a whole process to process these applications to assure themselves that it's done safely and that it's done on a – without impeding their ability to grow their network. So one of the reasons these permanent obstacles are a burden, Your Honors, is because the railroads have to be able to double track and single track and add sidings. And if they don't have a right to move this cable line once it's in place under this regime, the state's response to that is, well, you can go in and ask the commission for permission to relocate the line. But that's just jumping out of the fire – the pot into the fire, Your Honor, because the law is really clear that there should be no role for state regulatory agencies in deciding where we put our sidings, how we put our sidings, whether we do an industrial leak. All those railroad questions about how we operate our property. If you can't process the application within the expedited timeframe, what's the remedy there? What happens? So we have 10 – 15 days, 10 days to ask for additional information. They have a few days to respond. Thirty-five days after that, we have – But can you petition the commission for additional time? No. Well, we can go to the commissions, but the commission has three different standards by which they can grant it. We actually have to demonstrate in that period of time that there's a serious safety problem. And if we haven't had enough time to do it, Your Honors, that's not an adequate remedy is to go to them. But if you need the additional time under this statute, can you get it? It doesn't appear to be one of the three prongs by which the commission is authorized. So we have to come to them with a showing that there will be a severe safety problem within 35 days of the request. And as you can imagine, Your Honors, the railroads – I see my time has expired. I don't want to – No, no, no. Go ahead. Thank you. So that's our allegation is it's insufficient as a matter of timing. But I would say, Your Honor, the other core allegation on unreasonable burden is that all of these permanent placing – like AT&T comes and says, I want to cross here. That's not going to unreasonably burden a large network like Norfolk Southerns or CSX. Then they come and they're down the road. And then you've got another one down the road. This is a death by a thousand cuts type of argument where all we're asking for as the association is the right to present it on the merits to a federal district court judge and not be told that you actually have to show that one cut is so deep that that in and of itself is an unreasonable burden. But a thousand such cuts – if we can't show that it's reasonably likely to happen, Your Honor, then we're going to lose. But we should be able to get to the merits of the commission. If we were to invalidate the statute facially, where does that leave the state and its interest in providing broadband access to a wide variety of rural communities? I mean, are they left high and dry because you can just take your own sweet time in approving the application? I mean, I think the obvious solution here, Your Honors, was just to add broadband providers to the normal eminent domain statute, which they're currently not part of. But what incentive is there in the absence of the statute for you to act promptly on the broadband application? Well, Your Honor, if they have a right of eminent domain under the generally applicable eminent domain statute, which requires fair market value and assessment of public use, then we would be in the same situation that any property owner is in. If they come up and they negotiate, we know that there's a backstop of a legal remedy under state law, which is generally applicable to all property owners. My question to Your Honors is why should the railroad industries be the only ones burdened by a bespoke, hyper-accelerated takings regime that has fixed caps, unlike any other property owner in the state of Virginia? That runs right afoul of this anti-discrimination project. But aren't railroads unique among the property owners in Virginia? No, Your Honor. The property is property. They own it, and they own it in fee simple. Why are they unique? Why is a railroad who have a lower property interest than a farmer who doesn't want broadband crossing their property or a road or any other property? What other kinds of crossings are you dealing with other than track crossings? Well, any time they lay cable, they have to cross somebody's property, Your Honor. I'm not a cable line property expert, but they have to run the cable, so they have to cross property owners, farmers, states, utilities. I don't know the full scope of people, but what I do know is the railroad community is the only community that's burdened by this particular regime. Can I ask you a question? I understand your standing arguments.  If just hypothetically say I think, yeah, you have standing to raise these claims, if we thought we should sort of vacate the standing holding and send it back, like what do you expect would happen given that the district court has already said what it thinks about the merits? Do you think it would hold it under Pullman? No, no. Well, I don't think if you send it to just the discrimination, if you send it back because you say it's a viable claim, that's the whole reason the district court rejected it. So the district court would then have to engage. But that would be us reaching the merits. Like we say, oh, no, that is a viable claim. I'm trying to sort of hypothesize a ruling that just said viable or not. They obviously have standing to raise it. Yeah. I do believe, and I've struggled with this because of the weird posture of this case, is that since his standing analysis is premised on his ruling that it's not even viable at all, that you can't present it, I do think you have to reach that issue, not the merits of it, not saying whether as applied to this context, whether it's preempted under the discrimination prong. You have to at least say that the prong does exist. It does apply to this type of regulation. But we have to do that for this to be worth your time. Because, like, technically as a matter of standing, again, we usually don't reach the merits. We would just say there's no reason. So hopefully what would not happen is you'd send it back, and we'd get a 12 v. 6 ruling that there is no cause of action, and then we're back here on appeal with exactly the same conversation. Yeah, that's what's so weird about this case, right? Yes. So that's why I am recommending, Your Honors, reach at least indicating that we, the association, can present a challenge of whether it's both discriminatory. What would you have standing in this situation? Are we opening the door to federal courts for trade associations to come in and press the association's agenda, even though there hasn't been an involvement of an individual member of the association experiencing some sort of concrete injury? I mean, are we just opening the doors to the lobbying community and to interest groups pushing an agenda without concrete injury on the part of one of their members? Do you see my concern? Yeah, I absolutely understand your concern, Your Honor, unequivocally. And I would just say two things. One is I don't think you're throwing open the doors. This is a specific question of whether the Association of American Railroads has a right to bring a challenge under a very specific statute. But I would also observe that there's no question below that the railroads were injured. Isn't that prong one? I thought the parties agreed that the individual members were injured and could sue on their own. That's right. So this is not a case where there's a concrete injury, as was decided below. I've gone way over. I haven't touched on takings, but I think that's been well-briefed on that. I don't have any reserved room all the time, so I just appreciate the court for your consideration of this case. Hold on a minute. I want to make sure that my colleagues don't have further questions. Of course, Your Honor. Thank you very much. Thank you. Good morning, Your Honor. Ms. Mailey, are you pleased to hear from you? Good morning, Your Honors, and may it please the court. I'm Erica Mailey, representing Jamal Hudson of the Virginia State Corporation Commission. The district court correctly dismissed this suit. The Association of American Railroads lacks associational standing for any as-applied ICTA or takings claims. These claims require a fact-intensive, individualized analysis that necessitates the participation of individual railroads. Can I ask you a question about that? Sure. On page 26 of your brief, and this is about the takings clause, you point out, and you put it in italics, they're only looking for facial relief. There's no request for damages. There's no request as to any particular taking. This is just equitable relief, no damages. That is what the court says in Worth v. Sildon. That's like the paradigmatic case where you don't need individual members. All we're looking for is a facial relief, a judgment that this thing on its face doesn't work. So why do they need individual members? They don't for facial claims, Judge Harris, and I'd like to- As you point out, that's what they're bringing, so why did the district court say they didn't have standing? Well, what the district court held was that a facial claim fails as a matter of law. Right, but how can he do that when the question is standing? We have said so many times, and the court has said so many times, those are two different inquiries, and for standing, you assume the validity of the underlying claim, and then you figure out, has a person been injured, do you need the members? I just don't understand. Did this get argued below as a standing case, or did everyone just jump right to the merits? It's both, Your Honor. It's standing for as-applied claims and merits for facial claims. We don't dispute that an association can bring a facial claim, but a facial takings claim- Do you dispute that the district court held that they couldn't because it said, I'm dismissing this claim for want of standing? It dismissed the claim for want of standing because it held that a takings claim for lack of adequate compensation can't be brought on a facial basis. So the only valid claim would be an as-applied claim, and an as-applied claim lacks associational standing. It's actually quite similar to the rent stabilization association case that we cited in our brief from the Second Circuit that also involved an association seeking to bring a takings claim, and the court there similarly held, you can't bring a facial takings claim because it's not a situation where there's no application of this law that could be constitutional, and you can't bring an as-applied claim because takings claims can't be brought as-applied without the participation of the actual individual owner who can demonstrate the necessary facts about the property being taken and its value. All right, but that's- did you have further questions on this point? I mean, basically, as I understand it, you are saying perhaps the district court shouldn't have called this standing, but, like, what's the label? As to the facial claims, I think it's better understood as a ruling on the merits, that no facial claim can survive legally. As to the as-applied claims, it is a standing issue, Your Honor. The as-applied claims require the participation of individual members and thus can't be brought under associational standing. Is that because, you know, the court has told us that whether a challenge is facial or as-applied, it's not a matter of pleading, right? So if a- when the court looks at a complaint that brings a claim, that a statute, it's- the court considers this might be a facial challenge, this could morph into an as-applied challenge down the road if the evidence doesn't come in to support a facial claim, right? So the court has to consider that whole universe, which I think- I read the district court to be attempting to do that and saying I'm not just limiting myself to looking at did they plead a facial claim, but I'm also going to consider, like, could they pursue an as-applied claim? And as to that, there would be no standing, right? And then facially, this doesn't go anywhere because it's a takings claim and you have to be individual. That's exactly right, Judge Rushing. And ordinarily, if a complaint can't state a facial claim, it could still proceed past a motion to dismiss on an as-applied basis, but- Right. That's why we don't- courts don't usually grant motions to dismiss based on, like, failure to plead a facial claim because it can change over time. You're not limited to that. But the court went on and did that as-applies analysis and said, well, it's an association, they can't bring that. Absolutely. And that's even though the only claims and the only relief expressly sought is complete facial invalidation of this statute. The court also went on to consider could there be a valid as-applied claim and concluded that any as-applied claim here would fail for lack of associational standing because both the takings analysis and the ICTA preemption analysis is a very fact-intensive as-applied analysis. I totally understand that point on the takings clause side. I'm grappling more with the preemption, the sort of non-expressed preemption side because saying that it's fact-specific doesn't by itself mean individual members have to be there. Like, I think it would be fact-specific to figure out whether this statute sort of unduly burdens railroad transit. But we don't ask does it individually. That's not a crossing-by-crossing inquiry. It's just how does it affect rail transit. And so I do see that you would have to look at facts, but I don't see why individual members would have to be part of the litigation. Well, for the undue burden, it would require a crossing-by-crossing analysis to determine is that crossing creating a burden on rail transportation. And that's what courts have considered this in the Surface Transportation Board a number of times specifically with regard to laws that govern railroad crossings because lots of traffic utilities routinely need to cross railroads. And they have said those laws are not preempted unless the particular crossing either impedes railroad operations or poses safety risks. And if that standard is not met, then they are preempted. So that requires looking – But I feel like if the claim is more like – and I'm not saying this claim prevails on the merits, but it's more like I'm looking at this statute. It says 35 days. That's just unworkable as far as rail transit goes. That's not like a crossing-by-crossing inquiry. I totally understand your argument for why you would not prevail. I understand arguments for why it's premature. I just don't get why it matters whether it's AAR bringing the claim or a railroad bringing the claim. Well, Judge Harris, I think this ends up being a similar situation to what we were just discussing with takings, which is if you're looking at this as being a facial, categorical claim of preemption, we don't dispute that that type of claim can properly be brought by an association. However, this law is not within the scope of ICTA's categorical express preemption. And once you're beyond that, once you're talking about implied preemption and burdens, that's a very fact-specific analysis. Well, maybe so, but the whole reason for the statute and the ICTA was to protect railroads against or was to provide a certain degree of uniformity to the commercial lanes and the channels of commerce in this country. And the whole idea that the railroads would be undergoing 50 different state regimes, some with expedited proceedings, some with one set of conditions with regard to crossings and other states with other sets of conditions on crossing. I mean, there's a place for disuniformity in our federal system. But when you read the ICTA, Congress, it seems to me, was after a certain degree of uniformity. And to have the railroads fighting off 50 different kind of state regimes in terms of broadband applications or other problems involving crossings may seem to go against the grain of the statute. Because if you look at it, that they want a certain degree of uniformity with regard to rail transportation, that cuts against this as-applied theory that you're talking about. And it argues the uniformity Congress sought to achieve argues in favor of aggregate determinations rather than as-applied determinations. I mean, you've got to grapple with this federal statute and whether it contemplates aggregate decisions, aggregate actions on the part of the railroad that they can bring aggregate challenges because the disuniformity is almost by definition under the ICCTA would be, the as-applied challenges would almost be definitionally at odds with Congress's purposes in the ICCTPA. Judge Wilkins, if I can unpack this a little bit. Certainly, the ICCTA is concerned with uniformity for railroads. And there is certainly a category, two categories of state laws that are always considered as disrupting that uniformity in problematic ways and that are always going to be categorically preempted. But crossing laws are outside that scope. And so those laws are laws that deny a railroad the ability to build or continue railroad operations and laws where a state is attempting to directly regulate matters that the service- Well, you make the point that, oh, well, these crossings are de minimis and they're nothing but licenses. They're not easements. You know, I'm not sure. I mean, a license is something that has a termination date and an easement is more permanent. And this doesn't necessarily seem to me to have the characteristics of a license. It seems like the crossing is more of a permanent thing in the nature of an easement. And so why do you say this is so de minimis as to be outside of the purview of the ICCTPA? It's outside the purview of the ICCTA's express categorical preemption. And so any preemption has to proceed on an as-applied analysis that considers whether a particular crossing either impedes railroad operations or- Where do you get that in the language of the statute? That is the language from STB decisions that's set forth in the- No, I'm talking about the statute. From the statute, it's implied preemption. So it's not in the language of the statute. As to express preemption, a number of courts have held that crossing laws aren't within the scope of ICCTA's express preemption provision because the language of the statute is a regulation of rail transportation. And a regulation of something that's going under the tracks, over the tracks, the rail transportation continues. So it's not a regulation- Not necessarily during the period of construction. Every court that's considered this issue has held that railroad crossing laws do not expressly preempted by ICCTA. And the Service Transportation Board has consistently held the same. Now they can be- Some of these other cases dealt with a situation that's comparable to this in terms of expedited review. I don't recall a case- I'm referring for these other cases that held that all of these things are de minimis. It's not necessarily that they're de minimis, Judge Wilkinson. It's just that they're not expressly preempted. You're saying they're not interfering with railroad transportation. So that sounds a lot like a de minimis test. I'm saying that they're not preempted unless there's a fact-specific showing that they are interfering with railroad transportation. And this has been considered in terms of all- Why wouldn't they? I mean, you read in the newspapers all the time about train delays and Amtrak trains being behind schedule and all the rest. And I'm not sure why construction of railroad crossings might not provide some kind of- might not constitute some kind of cognizable impairment of transportation. In a particular application, perhaps they could, Judge Wilkinson, and then that particular application would be preempted. But litigating application by application after application and each- having each application be a potential candidate for SCC review, isn't the burden of litigation substantial on the railroad? I don't think so, Your Honor. And I think in a number of ways my friend is misunderstanding how this statute will operate. For instance, claiming that this is a permanent immovable taking. Nothing in the statute states that. And in fact, if it did become a safety issue, if it did become an impediment to construction later, the railroads can require the broadband companies to move the line. To the extent that you and your colleague disagree on what the statute means, and that's just one of several places where you seem to disagree, the meaning of the statute is before the Virginia Supreme Court now? Yes, it is, Your Honor. So we will get news soon from the Supreme Court of Virginia about what this statute means? Yes, we will. The Commonwealth is going to be filing its response brief in that case on Friday this week, and it raises exactly those same questions. So it's our position that this court can affirm on the basis the district court ruled because associational standing is lacking. If this court were to disagree and find that it needed to reach the interpretation of certain provisions to properly dispose of this case, then I do think it's very relevant to note that the Virginia Supreme Court is considering those same questions right now. It's the same ICTA preemption claims, the same takings claims, and even takings claims under a more demanding standard of the Virginia Constitution are currently tended. Well, nobody's taken anything at this point. No one has taken anything at this point, that's correct. But the court's going to consider, the Virginia Supreme Court will consider this argument that these caps are at least as to the zero and the $1,000 caps, that those are immovable. Yes, they're considering, that case does involve the issues both as to whether the licenses or easements are immovable, and also whether the compensation provisions or caps, or as the commission contends, should be interpreted as default amounts that the commission has the power to increase as necessary to provide adequate compensation. So I'd like to also briefly discuss the discrimination task. I think it fails for two reasons, and perhaps the simplest of those reasons is that they have not shown that there is discrimination, because they have not shown that there is a comparator who's similarly situated. That's not what the district court said, right? The district court said there's no such thing as a discrimination claim, so you lose that on the merits, and therefore you don't have standing. The district court held that the discrimination claim is part of the police powers exception, which is part of the express preemption test, and that the express preemption test doesn't apply to railroad crossing laws. So the effect of the district court holding was, even if this discriminates against railroads, that's not a problem. The discrimination prong does not apply here. Is it fair to read this statute? I mean, I don't want to repeat Judge Wilkinson, but it seems to me the one thing that was clear from this statute was that localities were not supposed to be able to single out railroads for less advantageous treatment. I think that the main thrust of ICTA preemption is to make sure that states can't interfere with the operations of railroads, and that it's not primarily concerned with discrimination, except to the extent that the discrimination does interfere with the operations of railroads. And so part of the issue under there, if it's a free-floating requirement, there can't be any discrimination against railroads. It would seem to sweep considerably beyond the main thrust. Are there ways in which Virginia seeks to discriminate against railroads? Like, what are you worried about? Are there things you want to do that would be discriminatory against railroads but would not interfere with their operations? Well, I don't think we're saying that we are discriminating against railroads. No, I know you're not, but I'm wondering what the sort of state's interest is in this argument, or does the state have things in mind that it currently does that discriminate against railroads, but in your view doesn't actually have any bad effect on railroads? I mean, I'm not aware. Of course, our friends are claiming that this law discriminates against railroads, but perhaps the simplest answer to this question is to say there is no discrimination here because railroads are in a unique position, and that's due to the nature of their property makes them a unique obstacle to broadband expansion. When it comes to discrimination claims and comparators, like, we don't usually say that can be resolved on a motion to dismiss. That seems like a fact-intensive argument you would want to have in front of a district court. Well, I do think, again, it's our position that the discrimination test is actually part of the express preemption provision, which is inapplicable, so that it's not this freestanding facial claim at all. But if the court were to disagree, I think they still have to plead enough facts in the complaint to show that there is a similarly situated party being treated more favorably, because that's the definition of discrimination, and they haven't shown that another party is similarly situated, and railroad property is in very long, contiguous strips. And so if you're trying to expand broadband Internet access, especially to rural communities, which is the key goal of this statute, railroads pose an obstacle to that that no other landowner does. So it seems to me that whether we're dealing with express preemption or implied preemption or the state police power exception to this or that, and then the discrimination question and the question of undue burden and everything, that in a way all of these different intersecting questions seem to boil down to a matter, I'm just thinking out loud because I think this is a very interesting and close case, but it seems to boil down to whether an as-applied challenge is the way to go about this. Okay, all tracks lead to the question of whether there's an as-applied mechanism to this. One of the problems I have with this is that when we are asked to strike it down facially, we're almost making the judgment that this is an undue burden, and we don't have the facts before us. And so I'm just again thinking out loud, is the way to get the facts before us to see how the as-applied challenges work out in practice, and if it's difficult, if they do pose an undue burden, one way to remedy this is to go back to the state legislature and deal with it in that way. Another way, it seems to me, is to press the state corporation commission for broader rulings that have a precedential effect. So even if we would agree with you that the as-applied route is maybe what we should do at this very early stage to avoid engaging in speculation on what might be a legislative matter, that doesn't cut off the fact that the state legislature and the state corporation commission and everyone else can profit from experience and to see whether this expedited review situation does in fact result in snags for railroad transportation and the rest. But the qualms I've had is that we're being asked to do an awful lot at a very early stage, and I'm a little bit uneasy with that. And so I think there's a good bit to what you say about the as-applied challenge, but I'm also sensitive to the fact that Congress had an overriding goal in mind, which was not to see the railroads snagged up in a bunch of state legislative squabbles that imposed different burdens on what is by its very nature an interstate enterprise. So, I mean, your opponents are not without arguments. Neither are you. But the problem is I'm asked to speculate without many facts. Yes, exactly. I see my time's expired, but if I could respond briefly. I think that's exactly the problem here, and that's why facial claims are so disfavored. They're asking to completely wipe this statute off the books, even though it may have many applications that won't pose any problems for railroads. And it's better in this situation to wait for an as-applied challenge, and there are already as-applied challenges pending, both before the Virginia Supreme Court and in federal district court, which has been stayed waiting for the Virginia Supreme Court interpretation, that will have more of a factual basis. But the Corporation Commission believes it's not going to be nearly as problematic in practice as our friends are fearing that the statutes can and should be read harmoniously to avoid applications that are going to have burdens on railroads. Well, and it does seem to me that the State Corporation Commission, through its decisional law, can take significant steps to minimizing the burdens on railroads, and the statute authorizes them to do so. I completely agree, Judge Wilkinson, and the Corporation Commission, the railroad can petition on the basis that a crossing would pose an undue hardship if a crossing would unreasonably burden a railroad within the meaning of the ICCTA, then it would also be an undue hardship under the meaning of the statute. And so the Corporation Commission is very aware that these statutes should be read with a backdrop of the federal guidelines. But the Corporation Commission is not precluded from talking about burdensomeness in class terms. This kind of application under these circumstances are unduly burdensome. And it's got authorization from the statute to do that kind of thing. It does, yes. Judge Harris, would you like to address me? Thank you, Your Honors. Thank you. Thank you. Mr. Adkins? So I went way over on my time, Your Honors. I just want to answer one question that you asked me, and then any other questions from the Court, which is Joint Appendix, page 21. I want to come back to it. I just want to say it's hundreds of crossings since 2012. You're asking us to take on faith the fact that this statute imposes an undue burden upon railroad transportation. And yet we don't have the facts, really, to make that sort of – to make that kind of judgment. We're just dealing with a hypothesis that you're presenting. And the hypothesis is devoid of actual factual basis. That is the problem I'm having. I understand, Your Honor. And the reason there have been no facts developed, Your Honor, is because we've got dismissed on standing grounds. So you need to look at the allegations that were set forth in the statute on discrimination, which I think is our strongest case. It does not require the participation of anyone. You can see Joint Appendix 32, Joint Appendix 20 on information and belief. No Virginia law subjects any other class of property owners to the kind of quick take easements contemplated, let alone on such limited grounds to resist the taking and burden shift of the property owner. We allege that broadband providers need to cross non-rail property too. So the allegations are all there in the complaint, which should have been sufficient to get us standing to move to maybe a 12B6 motion, but I think past that, to developing the case and presenting it in summary judgment. Same thing on unreasonably burdensome. The complaint, Joint Appendix 34, Joint Appendix 37, the statute does not provide sufficient time for the railroads to conduct an engineering or design review study. That's our allegation in our complaint. We don't have more facts in there yet because we never got past go. And then the need to move the crossings. Railroads routinely modify and upgrade their track, and they need to be able to move these immovable obstructions, and not being able to do so creates an unreasonable burden on interstate commerce. So I totally understand, Your Honor, where you're coming from. We don't have a well-developed factual setting because the whole case got dismissed on standing grounds. So I don't want to keep going well over my time, but do you have any other questions? I mean, we haven't even talked about it. There's one set of crossings here where we get zero compensation, which we think is a per se taking, and their claim is that, no, no, no, we can go to the commission to get relief. Look at the statute, Your Honor. You don't need to wait on that. It says, in no set of circumstances can the broadband provider be required to pay a licensing fee. It says what it says. It doesn't create any wiggle room. Same thing with the line that's abandoned. Doesn't that depend a little bit? I mean, the state says it depends on the scope of the existing easement, right? If they track it directly through an existing easement, it takes nothing. So I'm not aware of that ever happening, Your Honor. But it could, right, in your facial challenge. But it could. That goes to the remedy that we get, right? It doesn't go to the pleading stage. That's what your court has said. It goes to the remedy that we can seek. So if we can come up with a crazy hypothetical where somebody wants to run a broadband through an existing conduit where they already have an easement, we might need to carve out the injunction. But that's a reason why takings claims are really not amenable to facial challenges. You have to hypothesize every possible way the property could be taken. But this one, I agree. I appreciate that, Your Honor, I do. But we have one here where they take it for nothing. I mean, like, it's hard to even imagine a case that we couldn't bring a facial challenge where they say, you have to come on to our property at this public crossing, and you get nothing in return, zero. That seems like there's no legal remedy, right? There's no adequacy of remedy. There are responses. And you can imagine a case where we're not actually taking anything is their response, and it sounds like the state Supreme Court will address this. And it's premised on them coming to us for our permission. So there's a conduit from which they have to operate. But nobody's taking anything. And how can you determine the compensation that's due someone if we don't have a taking in front of us? The statute is set up to give us zero compensation. That has got to be a per se taking. If we have any property interest at all, and let me just note on the taking issue in the complaint, if you're going to look to the allegations, the railroads retain fee simple or other property interest above and below their right of ways at public crossing locations, period. So that's the allegation that's set forth in the complaint. This public right-of-way question is one of the very questions before the Virginia Supreme Court right now, isn't it? It's a public right-of-way crossing in one of those cases. They're not in the Norfolk Southern case. I can't tell you if they are in the CSX case. But I do believe that all of these issues have been presented to the Virginia Supreme Court. Now, whether you defer or wait on them, I actually don't think there's any reason to. We have a federal challenge of a federal right to bring a case in federal court. But if the question here, if the basic tension here is between facial and as applied, the normal understanding of a facial challenge is to say that in no set of circumstances, we have to wipe out the whole statute because in no set of circumstances can it be lawfully applied. Can I give you an example, Your Honor, where that goes to the remedy? I'll give you one example, and then I'll sit down. Okay. The railroad industries, they are routinely challenged as regulations as rampant. But can we say that in no set of circumstances can this be lawfully applied, and that's exactly what a facial challenge normally means? Now, maybe. So let me try to answer, Your Honor. First, on discrimination, we have a facial challenge. It's discriminatory in every application. Going to the remedy, routinely the AAR brings challenges against statutes that regulate rail transportation, and people will come back and say, well, you haven't demonstrated it is unconstitutional in all applications. Why? Because there are a few railroads in the state that aren't subject to the jurisdiction of the Surface Transportation Board. There are a few railroads that don't get any of these protections from the Interstate Commerce Act. And so they'll say, well, you're bringing a facial challenge. We say, no, no, no, no. You know, it's not a facial challenge as it applies to that circumstance. We can craft a remedy that satisfies the, you know, that fits within our theory of the case. And you could do that here. We could have a remedy that only focuses on public crossings if you believe that individual participation is necessary or that no set of circumstances would apply to the $2,000 one. Or we can craft a remedy that says it should only apply to, you know, only based on where we can show it's going to be an unreasonably burdensome. Our point is that the discrimination claim shows a facial preemption problem. Our cumulative burden argument, if it's true, would invalidate the law completely as it applies to regulated railroads. And our takings law, we think the remedy could have been fit to the circumstances of each of the types and categories. And so we should have had standing to at least present that theory as well. Thank you very much. I very much appreciate all the latitude on time. Judge Harris, do you have anything to refine?  Thank you, Your Honor. We'll come down and greet counsel and then move into our final case.
judges: J. Harvie Wilkinson III, Pamela A. Harris, Allison J. Rushing